NORTHERN TRANSP. CO. (VAN SCHAACK v.). See Case No. 16,876.

---

## Case No. 10,325.

### The NORTHERN WARRIOR.

[1 Hask. 314.] [1]

District Court, D. Maine. Dec., 1870.

COLLISION — LIGHTS — NARROW CHANNEL — STEAM AND SAIL—PERSONAL INJURIES TO DECK HAND ON STEAMER.

1. In cases of collision, the want of proper lights is immaterial, when their absence did not occasion or contribute to the disaster.

---

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

2. A sailing vessel, beating through a narrow channel, is not required to hold one course longer than prudence requires, considering the nature of the channel, and the strength of the wind and tide.

3. The testimony of competent seamen on board such vessel, as to whether she was managed with skill and prudence, is entitled to more weight, from their better opportunities to observe, than the testimony of witnesses on board another vessel, who had no particular opportunities to judge of the matter.

[See The Hope, 4 Fed. 89.]

4. A steamer, about to meet a sailing vessel beating through a channel 300 feet wide, is at fault in holding speed at eight knots.

5. It is the duty of the officers of a steamer, under such circumstances, to have such command over her as to avoid all reasonable chance of accident.

6. A deck hand on board such steamer cannot recover of the sailing vessel damages for personal injuries received in a collision between the two vessels, caused by the fault of the steamer.

In admiralty. Libel in rem by one of the deck hands of the steamer Alliance against the schooner Northern Warrior, for damages to his person received in a collision of the two vessels. The owners of the schooner made claim, and answered that the collision occurred without her fault, but from the fault of the steamer.

Charles Hamlin and Charles P. Mattocks, for libellant.

Thomas M. Giveen, for claimants.

FOX, District Judge. This libel is promoted by one of the deck hands of the propeller Alliance against the Northern Warrior, for severe personal injuries, sustained by the libellant in a collision which occurred between these vessels in the Penobscot river, about 6 p. m., on the evening of the fourth of November last. The libellant was in the forecastle of the Alliance, was knocked down by the bowsprit of the schooner, which was forced through the bulwarks, and broken in two or three places. Three of his ribs were fractured, and he was also severely bruised and otherwise injured, and from the testimony of the physicians, it is evident that his injuries are of a very severe and permanent character.

The schooner is a flat-bottomed scow, with three keels, fifty-three tons burthen, twenty feet beam, square stem and stern, drawing three feet light, and something more to leeward when on a tack, and could not run in safety in less than four feet. She carried bowsprit and jib-boom, with jib and fore and main-sail, and was used for transporting lumber in and about the Penobscot river and bay. About 4 p. m. of the day of the collision, she sailed from Bangor, light, for Stearns Mills, about three miles below, with a captain and mate on board, who are also owners, and are shown to have been for many years acquainted with the navigation of the river. She exhibited no lights. There was a bright moon. The wind at the time

of leaving Bangor was light from the north-west, and so continued until they had reached within three-quarters of a mile of the mill, when it changed to the south-west, and as the channel there takes a south-westerly course, it was necessary for the schooner to tack to reach the mill.

The Alliance is a three-masted propeller of 418 tons, with a usual speed of eight knots, was on her regular trip from Boston to Bangor at this time. It is alleged in the libel and shown that she had burning the red and green lights, but it is not averred that she had a white mast-head light as required by law, and from all the testimony, it is doubtful whether she showed any such light. The question as to the lights of either vessel, I do not hold material in the present case, as in my view the want of them did not occasion or contribute to the collision.

The night was clear moonlight, and quite light. Vessels and other objects could be and were seen at a long distance, and it is proved that each of the vessels was seen from the other when more than a mile distant, and they continued in plain sight of each other until the collision occurred, which was just before six o'clock, with the tide about half flood.

The place of the collision was nearly opposite Stearns Mill. The river is there about 600 feet wide from bank to bank. On the western side it is shoal. About half way across there is a bank of edgings, drift stuff, &c., a portion of which, about ten or twelve rods long and half that width, is bare and more or less exposed at low water, from one to three feet in height, according to the state of wind and tide. From this bank to the eastern shore is about 300 feet. Flats extend a few rods from the eastern shore at low tide. The remainder of this space is the channel with a good depth of water. At high tide small vessels can run between the west shore and the bank of edgings.

Having made quite a number of tacks after the wind had changed to the south-west, the schooner was seen by the lookout of the Alliance at the time she began her last tack westerly from the eastern shore, the Alliance at that time being over on the western shore. At the same time the Alliance was seen by the lookout of the schooner, who testifies that the propeller did not show any white light, but only her port-light, and he supposed she was a three-masted schooner at anchor, as he could see her masts.

The regulations require that vessels at anchor shall show a white light, and no reason is suggested by the witness for his mistaking a red port-light for the proper anchor-light. When the captain of the Alliance saw the schooner tack on the eastern shore, he gave orders to port, and go to the eastward under the ship's stern. The propeller was then going eight knots, and her speed was not reduced until the collision became inevitable.

The schooner having commenced her tack westerly, after running a certain distance came about, and whilst nearly in the eye of the wind, heading down river, her fore and main-sail full, with her jib not drawn away, the collision took place. The schooner was under a slight headway, but not sufficient for steerage-way. There is some conflict of testimony as to the position of the vessels when the schooner came about, the master and witnesses for the Alliance stating that they were not more than fifteen rods off, whilst some of the witnesses for the schooner say that they were forty rods distant. Considering the speed of the propeller, and that an attempt was made to stop her before the collision, I am of opinion that the statement in behalf of the schooner in this respect is probably the most accurate.

It is claimed that the schooner is accountable for the collision by not having run out her tack as she was by law bound to do; that if she had completed her tack, the collision would not have occurred, as there would have been ample space for the steamer to have gone to the eastward, under the stern of the schooner, as the captain says he intended to do, if she had run on her west track as far as she ought to have done. It is said that she could without difficulty have passed over the bank or edgings, or if not, that she did not go so near thereto as she safely could, but that she unreasonably shortened her tack. The tide was about half flood, the rise and fall, as I understand, was about twelve feet. The schooner on a tack required four feet. The edgings at low water were exposed one to three feet, and from these data, it is certainly very doubtful whether she could then have passed over the bank with safety. The night was so clear that vessels at the mill wharf and objects on shore were plainly discernible. The captain of the schooner from his boyhood had been well acquainted with the locality, the mate had known it for more than twenty years, and both of them testify that they could not have crossed the bank, as the tide then was. Their testimony is corroborated by two of the crew of the schooner Arabella of Kittery, who were at the time on a wharf on the eastern shore, directly opposite the bank, and who were acquainted with its situation and height. One of them states that at the time there was but a little over two feet of water upon it, and Curtis, the first mate of the propeller, also swears that the schooner could not at this time have passed over the bank, and although the captain and some other officers of the propeller express a different opinion, I am well satisfied it would not have been prudent and good seamanship for the schooner to have attempted at that hour to have crossed the bank. Those on board the schooner, from their long acquaintance with the river and their knowledge of the capacities of their vessel, have the best opportunity to form an

opinion. No motive is suggested for their not passing over it, if it could have been done with safety. They had an interest as owners to manage carefully and prudently, and as the crew of the vessel to complete their trip as soon as was practicable, and their judgment, in my opinion, is entitled to more respect, corroborated by that of disinterested persons on the shore, than that of persons on board another vessel, who had no particular reason for forming a better judgment upon the matter. The weight of the evidence on this point is clearly with the schooner, and I hold she was not in fault for not attempting to cross the bank as the tide then was.

The law in relation to steamers meeting a sailing vessel when on a tack is very clearly expounded by Benedict, J., in the case of Whitney v. The Empire State [Case No. 17,586], the case of a schooner sunk in a collision with a steamer at Hell Gate, he says, "The remaining fault charged upon the sailing vessel, and the one most strenuously urged, is that she did not beat out her starboard tack. The duty of a sailing vessel to beat out her tacks, when meeting a steamer in narrow water, is unquestionable; but this rule does not require the sailing vessel in all cases to go as near to the shore as the depth of the water will permit, without reference to the other exigencies of the channel. In beating through a passage like Hell Gate, tacks must be made with reference to the safe passing points and shoals ahead, and when approaching Halletts Point with a strong ebb tide, a sailing vessel is entitled to come about in time to insure avoiding the reef at that point, although she may not be at the time of tacking as near the Long Island shore as the depth of water would permit her to go. The end of the southern tack of sailing vessels from Negro Point is therefore no fixed point, but must vary according to the capacity of each vessel and the strength of the wind and tide at the time. This being so, it seems clear that the opinion of those engaged in the navigation of the sailing vessel, who knew the capacities of their vessel and can most accurately judge as to the effect which the wind and tide are having upon her, is entitled to more weight, as showing the proper place for the tack, than opinions formed by persons aboard a steamboat approaching from below. In this case the testimony of the persons on board the schooner is positive and emphatic, that they proceeded as far upon the tack as it was safe for them to go."

Such also in the present instance is the statement of the captain and mate, the only persons on board the schooner. They are interested in the result, being owners of the schooner, but they are shown to have been well acquainted with this portion of the river for more than twenty years, and nothing is presented in evidence or stated in the argument as a cause for their adopting any other than a prudent and usual course at this time.

Pendleton who was on the lookout on the schooner says, that they were within twenty feet of the reef edgings, and Cornish, the master, puts the distance at fifteen or twenty feet. Mitchell, one of the crew of the Arabella, who was on the wharf about a quarter of a mile from the place of the collision, and who was watching the movements of the vessels, says, "The schooner could not have gone any nearer with safety; she was within sixty feet of the edgings, and there was twenty rods between the steamer and the eastern shore of the river at the time."

Frisbee, another of the Arabella's crew, gives the distance of the schooner from the edgings at the time of tacking as thirty feet.

Abbott, the second mate of the steamer, says, "The schooner came in stays about the the middle of the river." The shoal is near the middle of the river, and according to Abbott's account, therefore the schooner must have been near to the shoal or bank.

Curtis, the first mate, says, "The schooner tacked about the middle of the channel. We were as near the eastern shore as we dared to go. She could not have gone over the reef, but could have run eight or ten rods more on this tack and then tacked without touching the edgings. We were three to six rods off when order to reverse engine was given. Schooner's jib was not drawn away when she struck us."

The quartermaster, who was at the wheel says, "Schooner tacked in mid-channel, which is three to four hundred feet wide. I was within three or four rods of eastern shore and some five or six rods off when she tacked."

I do not find that the captain of the steamer testified as to the position of the schooner in the river at the time of the collision. He does say that the steamer was near the eastern shore, and after the steamer came off the rocks, she backed across the river eight rods beyond the place where the schooner tacked.

The balance of this testimony, in my opinion, is rather in favor of the schooner, and upon this point, the libellant having the burden of proof, I cannot find that the schooner was in fault for not continuing further on her westerly tack.

It is said that the testimony of the officers of the propeller establishes the fact, that at the time of the collision, she was as near to the eastern shore as she could run with safety, the quartermaster and others putting the distance from the shore as only three or four rods. In cases of this kind, occurring at night, but little reliance should be placed on estimates as to time or distances. In this instance, I am confident the libellants' witnesses are mistaken, as from their own testimony the collision took place as far west as mid-channel, which was 150

or 200 feet from the eastern shore, and the propeller could not therefore have been so near to the shore as is now claimed. Mitchell says the steamer was twenty rods from the shore at the time of the collision, and his position on shore and having no interest in the cause, entitle his opinion on this point to considerable weight with the court.

It is also claimed that the schooner was so near the eastern shore as to force the propeller upon the rocks. It is conceded that at this time the propeller went upon the rocks and there remained bows on for about half an hour until released by the tide, although repeated attempts were made to back her off. It is incredible however, that this schooner, without steerage-way on her, in a light breeze, and of only fifty-three tons burthen, could have forced this propeller of over 400 tons on shore in this manner. I have no doubt that the steamer was driven on shore by her own motion, with her helm to port, her engine not having been reversed until the instant of the collision. She then making eight knots, and it was entirely her own headway, and in no respect this little scow, which drove her with such force upon the rocks as to keep her there for a half hour on a flood tide with the whole power of her engine to assist her to come off. The steamer when free from the schooner ranged ahead, breaking off the jibboom as she went on, and after that the bowsprit, as they passed through her bulwarks into the forecastle. After the propeller was clear from the schooner, the latter came to anchor in the river, but not in proximity to the eastern shore as I understand the testimony.

It is admitted by Pendleton, who was the lookout on the schooner, that at the time he saw the propeller approaching them, and at a distance of forty rods, as he says, he hailed the steamer to go to the westward, and that she might have done so with safety. If so, there must have been the requisite space between the schooner and the bank of edgings, and it is therefore contended that the schooner could not have been so near to the bank as is now claimed. To my mind there is considerable force in this objection, and it has caused me to entertain a doubt on this point. But on the whole, I think that Pendleton might have supposed that the only safe course for the schooner, at least, was for the propeller to go to the westward. It was certain if she held her course that a collision would occur, as the schooner could not get out of her way, and the witness may have believed that as the schooner payed off to the eastward, the distance between her and the bank would increase before the steamer came up, so that there would be space enough for her between the bank and the schooner. It is not claimed that the schooner ran close up to the bank, but that she tacked leaving a rod or two, which distance increased rather

than diminshed by reason of the current and wind.

Evidence has been offered of certain statements of Pendleton, made by him to the agent of the boat the day after the collision, tending to prove that he agreed to pay for the damage sustained by the steamer. Their accuracy is denied by Pendleton, and payment was never made. Such evidence in cases of this kind is of but little weight and effect, and courts of admiralty as a general rule attach little importance to conversations of this kind after the accident. In determining disputed questions of fact appertaining to the navigation of the respective vessels, the court will as a general rule depend upon the positive testimony of the witnesses, rather than admissions or statements made as to such matters.

The captain and other officers of the Alliance have been examined as witnesses, and have endeavored to exonerate themselves in the mind of the court from all responsibility for the collision. The attempt has been without success; on the contrary, from their own statements, I think the course adopted by those in charge of the Alliance was the principal cause of the accident, and that their vessel was not managed with reasonable skill and prudence.

The captain admits that when he saw the schooner, he knew she was a fore and aft vessel, but could not see that she was a scow, as this was not the kind of vessels most usually and ordinarily found with this rig. He had no right to presume it was a vessel of this description, a light scow; but on the contrary, all the presumptions were that she was a fore and aft deck schooner, coming down the river with a cargo, such an one as could not possibly have passed over the bank at that tide. The captain, therefore, should have understood when he saw this fore and aft schooner making her tack, that she could not pass over the bank, but that her tack would be confined to the main channel, the narrow passage of 300 feet between the bank and eastern shore. Under this condition of things, it was not in my opinion safe or prudent for a steamer to pass at a rate of eight knots a vessel making her tacks in so narrow a passage. Such speed is altogether too great, and endangers the safety of both the steamer and sailing vessel, as there are always contingencies which may happen to a vessel tacking in so narrow a channel, to prevent her completing her entire tack, and which compel her to come about sooner than was anticipated. The 16th article of the rules relating to navigation requires every steamer when approaching another ship so as to involve risk of collision to slacken her speed, or if necessary to stop and reverse. In this narrow passage with a vessel ahead on a tack, those in charge of the steamer should have had sufficient command over her to avoid all reasonable chance of accident. As Sir

John Patterson, in The Batavier, 40 Eng. Law & Eq. 25, remarks, "At whatever rate the steamer was going, if going at such a rate as made it dangerous to any craft which she ought to have seen, she had no right to go at such a rate. At all events, she was bound to stop, if it was necessary to do so, in order to prevent danger being done by the swell to the craft that were in the river."

If those in charge of the propeller were keeping a proper watch and attending to the movements of the schooner, they must have seen she was about to tack four to eight minutes before the collision was imminent, as it took that time for her to come about. If they saw her movements, it was their duty at once to have stopped and reversed their engine; but they did nothing of the kind till she was square about, heading down river, with her square sails full. I am satisfied the signals to reverse were not given until the collision was imminent, and that her headway was retarded but little if any. Under such circumstances, it was a fault of the propeller not to have sooner slackened her speed and reversed, while if her officers gave their orders so soon as they were aware of the position of the schooner, then it is clear that there was not a proper lookout kept, as her change of position must have been sooner discovered with a vigilant watch, attending to his duties. Libel dismissed.